I'll reserve 12 minutes for rebuttal. May it please the court. My name is Todd Scoglin. I represent the log plaintiffs as assignees of Highmark Homes. There's two main issues before this court today. The first I'll cover is the duty to identify the interpretation of the track house endorsement. It is our opinion the district court read it as broad as possible, which is against Washington law. It specifically says they can build up to 25 or more houses within the time frame. Facts matter. Where does it say within the time frame? The language, as I read it, doesn't have a time frame to it. It does not, your honor. It does not have a time frame. That's why I said the district court read it as broad as possible. It does have a policy period. They bought a policy period. The district court cited Seattle Tunnel, which is the case, built a tunnel downtown, which is a project policy, which is 72 or 78 months long because of the project. And that's the case it cites. If you read the opinion, you won't see that time frame in it. You have to go back and pull the record and the actual policy. But if you flip through the policy referenced in the Seattle Tunnel case, Seattle Partners Tunnel case, it'll tell you it's 78. It's a policy, a project policy, which extended the entire project, which this is a standard CGF policy, which is a one-year policy, which ran from 7-16, 2010 to 2011, 11 to 12, 7-16, 12 to 13. There was four houses built in the second policy period. You agree that there were 25 or more residential buildings that were built in the development? I would concede it's a development, your honor. If you read the first part of my argument, each house was, that development was submitted by a different developer, and then Highmark Homes came in and it submitted individual certificates or individual plans for every house built, and he treated every project as a house. And then he submitted another house and then another house. And that's how he read the policy. So he decided, or he defines a project as a house, which is a standard term. Use a house as a project, could be a project, could be a number of projects. And the term most favorable to the insurer or insured is the term the court should use, not the one that the developer wants to use. And they want to use project. The policy uses the term phase? A phase? Yes, phase or development. Yes. Why doesn't that cover it? How many phases does it build a table or chair, your honor? You could build, a phase can be, this court has phases. It has a discovery phase. It has a opening statement phase. Well, you know, it's not realistic. Well, maybe it is with some builders, but it seems hard to imagine that a builder could build 25 homes in one year. As in the intro, this motion says there's four, actually this builder, if you look at the project, the beginning of this motion, you'll see there's four projects being at issue when... Yes, there's several other cases. He actually, I want to, I don't know the exact number in my head, but he had projects going on in houses built all over the place. A lot of these projects were combined. If you actually combined all the different projects... Can you slow down just a little bit? I'm having some difficulty following you. So maybe just slow down. I have, yes, your honor. Thank you. And so the way that there was actually a lot more than 25 projects going on at the same time. He's built, if you looked at all the projects, he contracted per home or project. Every contract was, there wasn't five homes at a time. Each house, if you look at the facts and these facts are undisputed, your honor, there's no dispute here. He contracted every house as a single project. There's a single framer for that project, a single plumber, a single roofer. As soon as that house was built and the city approved another house, he would hire, he would put up a bid, I should say, the roofing, the framing, the plumbing. And so that house or project would be done individually. These facts are not disputed. So he did not build this as a project. And all the literature I supplied to the court and there was no counter testimony to this. It must be noted to the court that they produced no evidence in this case except for their lawyers' arguments. Can I just read you the policy and then work from there? Yes, sir. We know that tract housing is excluded from coverage. Now the question is, what is tract housing? Tract housing is defined, and I'm on 14 ER 3773, and I'm just reading, tract housing is defined as follows. Tract housing or tract housing project or development means any housing project or development that includes the construction, repair, remodel of 25 or more buildings by our insured in any or all phases of the project or development. So why is this not tract housing under that definition? Because the way my client defined it is one policy period. The average person... No, I don't care how your client does it. Give me an argument as to why this is not tract housing. That's not how you're, I mean, that wasn't quite responsive to me. So why is this not housing? He built 25 houses or contributed to the building within the meaning of this phrase of 25 houses. So why isn't it tract housing? Because I've done it in a policy period. But in this language, there's no limitation as to policy period. It just says tract housing, and here's what tract housing is. But then if you read the first three or four pages of the policy, it says you must read this entire policy as a whole. Of course, you always have to do that. But in big, bold letters. Even if it were in tiny letters, I understand that. So you built four houses like this developer did that for four houses, right? And the policy ends four houses. So they built 21 houses in the next policy period. Why would the average person say that has no connection to this phase of project? Even if you want to call it a phase of project in that policy period, why would you assume that? You're reading the language as broad as possible. And the state of Washington says, you read that narrow, you keep it within the year. If you want a Seattle tunnel partner case. What language do we use to read in that one year limitation? The policy period. The policy period, Your Honor. And why would an average person assume that? Taking Judge Fletcher's question where he pointed you directly, he read the language from the policy that's in play here. You're basically saying we need to rewrite that to add in within a year or within the policy period. I'm asking the court to look at the policy as a whole and the policy period and that together. And when you read the exclusion and the policy period together, the average person would not assume a policy that no coverage of that next policy. There's no coverage. This is CGL policy, single family housing, not an apartment project where you'd have a continuation over policy periods. There's a distinct ending period when a house is built. What do we do with the fact that Highmark itself informed TIG that Highmark worked on 25 tract homes? I'm looking at 4ER-747. This is a statement of the builder that they've worked on 25 tract homes. I'm not sure of the phrase. I'll look at how it's speaking. But I would still argue that they thought the time frame was when tract homes are in that time frame. I, once again, the Seattle Tunnel case, you want the whole period or all the houses covered and the whole project, the whole development? You say no time frame. They paid a premium for coverage. They built four houses. So now there's no coverage for those four houses under this court's analysis, or what I'm referring to is the court's questions, or the 21 houses. It built, it bought coverage for up to 48 houses, and it got coverage for 25 houses, is how I look at that phrase. Because these policies, you build up to 25 houses, right? So each policy, you built up to 24 houses, right? So up to 24 houses, they did so in 4 and 21, under two different policies, they're covered. Unless... I think your argument is essentially that we should be reading in language and the policy that doesn't exist to be able to think about this as a per policy development as opposed to the entire period of all the policies combined, correct? That's exactly what I'm working on. Okay. So now I'm going to actually move you to a different issue because you're short on time and you wanted to reserve some of your time for rebuttal. I want to ask you about the bad faith claims. And the fact that it seems to me that some of the theories for your bad faith claim that you're raising now on appeal were never raised before the lower court. And in fact, sir, just let me finish my question. There was a motion for leave to amend the complaint that included the very theories that are now being argued to this court, and they were not permitted to be added to the complaint through a motion to amend. So I want to understand, and I'm particularly confused about this issue because you all make these arguments that weren't raised below and your friends on the other side don't actually raise the fact that you didn't raise these theories below and they address the merits of them, which I'm not understanding why. But what do we do with this fact now that you are asking us to decide issues that were not only not raised, but were explicitly rejected in your motion for leave to amend? Can we address those? Why should we address those? Are they forfeited? If they were briefed in the lower court, I believe they are before this court. And the reason they're not briefed to the lower court, they in fact, were not permitted to be included in your complaint. Not all of them. And I would argue first the duty to defend is very broad. And yes, I did not know that they fired their counsel. And there's some other things weren't known at the time that the accusations were made, but that doesn't preclude the fact that this court can't consider them when they were briefed and they are before the court. And I would, as far as we're on these claims, once again, there's no evidence contrary to the positions taken. And so as far as the bad faith claims and then firing their counsel and getting new counsel and then paying half the cost for the new counsel and putting all the costs on a, the other insurer, that is actually a motion for, there's a motion in front of the ninth circuit on whether or not that should be heard by the state court. I don't know if the court's aware of that. A certification. Yes, a certification. And so the issue was raised in another motion, maybe not directly. And the reason it kind of gets convoluted is the three cases, there's overlapping arguments. And I know they're all separate cases and maybe they should have been consolidated looking back at them all, Your Honor. They probably are more similar than thought, but that you don't find that out until discovery. And once discovery goes, you start understanding the different arguments and how they are all at a Washington law. I just want to be clear on, they're asking you to broad language on a CGL annual policy period to cover events that aren't covered outside of policy. It'd be no different than a car wreck in one policy. Then you get a car wreck later. You say, well, that, that's the worst. They're both covered. They see two car wrecks. Let me just ask you, let me ask you one question. So yes, there was an earlier case that we decided the ninth circuit decided, Hey, very familiar with your honor. Very. Yeah. You were probably counsel on that case, right? And, uh, it's the same policy provision, right? Yep. I think it's same project too. Different project, but same timeframe. Same timeframe. Okay. It's the same policy provision. Yep. The panel in that case, uh, didn't buy your argument. The argument wasn't made your honor. Why it wasn't made because 25 houses were actually certified for occupancy within one policy period. So you can't make the argument to policies were triggered. There's 25 houses built in one policy period under their policy has to be occurrence has to occur within the policy, right? It was, and they were certified for occupancy in one policy period. So it was stuck in one policy, but you couldn't make the argument that you can't, you're stretching it into another policy period to trigger your coverage. That is the essential, quintessential difference in all these cases. And there's different factual scenarios in each of these cases. That's where I think the hay case is that broad statement. The court made is incorrect. There's another, there's other cases out there that there's other insurers after this policy. So 20 houses were rough figure, but other houses were built while insured by another insurer to get 25. And so how far are you going to stretch this? And I know the court doesn't like hypotheticals and doesn't really look at them, but that's where the hay court, that broad decision, that would, I'll do you a favor, Judge Lasnik, that broad statement is, should be made in a Washington court because facts matter and every case affects an exclusion different. You know, the ninth circuit decision is a memorandum disposition, but it doesn't, it's not binding on us. It's not binding authority. And if you read the, it basically said, if they think there's 25 houses and they can point it on the, deny it on that claim on the duty to defend, so be it. There's no factual dispute there. Where in this case, the facts say four houses. So you got to go back in time where there's no coverage to get houses. And then you got to go forward in time, some more houses. If they want that policy in Washington, Seattle, the court's right to cite Seattle Tunnel because it's a project policy. If they wanted a project policy to cover all phases, all development of all time, they should issue it. The average person reading that policy would not think an occurrence six years later, two years, one year, whatever it is, would trigger an exclusion and deny coverage. Counsel, would you like to reserve the balance of your time? Thank you, ma'am. May it please the court, Chancellor Loboto on behalf of TIG insurance company. This is really a simple question of policy interpretation. TIG is not up here. It's just up here asking you to enforce the policy as written. Washington law is clear that if, you know, based on policy interpretation that clear and unambiguous policy terms must be given there, must be enforced as written. And that's all TIG is asking you to do today. The tract housing exclusion or endorsement explicitly excludes coverage for tract housing developments that are 25 or more buildings built by an insured in any and all phases of a project or development. This language has been enforced as plain and unambiguous by this court. I want to briefly address. You're talking about Hay. Yes, in Hay. Yes. And in that court, in that case, this court explicitly held, sorry, it explicitly held that um, neither is susceptible to competing interpretations, at least none that are unassailable. I'm sorry, you mumbled. I couldn't understand. Oh, sorry. I was just reading the log or the Hay decision. The court ruled that the exclusion is unassailable and not open to susceptible to competing interpretations. You say the conclusion is unassailable. What conclusion are you talking about? The tract housing endorsement applied to exclude coverage. Again, how does that help me? Give me the facts and it applies to that one. Okay. But well, in this case, in this case, uh, Highmark built 25 homes. It's not reasonably in dispute that this project did not involve more than 25 homes. And so, you know, this is the bargain for insurance that was purchased by Highmark. TIG sold the policy, but that is the policy that Highmark chose to purchase. But he says this, he says this wasn't a real project. As you might think about a project, you know, you think about, well, I'm a developer. I'm going to build 45 homes. Yeah. And, you know, but it takes time to build 40, 45 homes. He says, that's not what this was. Projects like that takes phases and, you know, whatever may take years. This, he says, was basically, he says each home was an individual project. Right. I'm not sure that that issue is properly brief before this court, I also don't think it's reasonable. Yeah. What do you make of it? I don't think it's reasonably in dispute. I mean, the, the Vintage Hills project contained much more than 25 homes and Highmark was the developer on all of them. The fact that it took multiple years and each house is built individually, that's how housing developments work. You know, you build them in phases, phase one, phase two. And it, of course it takes over, you know, it takes time, but I don't think whether one house was built and then they moved on to the other, how it disqualifies it as a phase or development. And I don't think the appellate's cite to any case law that supports that position. Was there an overall, you know, you have to go to the, I guess, to the county or whoever, the city to get the permits. Was it presented as a, you know, like this is a 100, 100 track home? It was, your honor. It was submitted as a plat to the county that, you know, each house was individually laid out, you know, and then Highmark went in and built each house individually and got certificate of occupancies individually. But it was all part of the same development that was submitted to the city of Bremerton, I believe. Yeah. Appellate's cite to the case Seattle Tunnel Partners, which is a case that does not apply to the facts of this case. It was cited to at the lower level to clear up some policy language. It basically was cited to, to show the language, you know, how courts are to interpret policies in the state of Washington. But Seattle Tunnels Partners is a first party property case that covers specific covered perils. In this case, we're dealing with a general liability policy that is a yearly policy and is really, you know, the trigger in a CGL policy is property damage caused by an occurrence. The trigger in a first party all risk policy is, you know, covered perils unless explicitly excluded. So they really are an opposite. And the rationale in Seattle Tunnel Partners does not apply to the facts of this case. Another thing is that the tract housing exclusion, it does not modify the insuring agreement. The insuring agreement stays the same. Rather, it is a limitation on certain types of coverages that was bargained for by Highmark when they purchased it. They explicitly, they being Highmark, explicitly chose to buy a policy that limited coverage to 25 or less homes. If they had built 22 homes, the tract housing exclusion wouldn't apply, but it's the 25 or more homes that makes the tract exclusion apply. These types of mandatory endorsements are routinely upheld and are part of, you know, the insurance procurement process. It affects premiums and how much the insured elects or, you know, wants to pay. I think the facts of this case show that there's two policies at issue here. There's the handover policy, which was wasting. And because it was very high, Highmark decided to get a second CGL policy. But this policy explicitly excluded coverage for 25 or more homes in any and all phases. So the two policies, one wasting, one with a tract housing exclusion, that's simply the insurance that Highmark chose to purchase to ensure their risks. It does not modify the insuring agreement. The insuring agreement still covers property damage caused by an occurrence. It is simply just a limitation on the type of coverage that is available. So explain to me a little bit more in layman's terms what was actually covered then. Well, the insuring agreement itself covers property damage caused by an occurrence or bodily injury. So if, you know, it was a single project and Highmark put up the home and or a single house in the project and the roof leaked and got down into the flooring, then, you know, the cost to repair the flooring would have been covered. It doesn't change the type of coverage available. It's just as soon as you build 26 homes and all the floor or all the roofs leak and get down into the flooring, then you have a limitation on the coverage and the tract housing applies to or applies to, you know, eliminate coverage for that type of project. There was a determination in a prior proceeding that Highmark was in fact liable for some of these home construction defects, correct? This was before they assigned their claims to the homeowners. I don't know if it was a finding, but they did settle the case. And I mean, sure. There was a judgment against Highmark for the construction defects. And then those plaintiffs who received that judgment in their favor against Highmark decided to pursue their claims directly as to TIG as opposed to Highmark, correct? Okay. So there was no effort to be able to get their repairs made or whatnot through Highmark directly. Highmark said here you can have our claims against TIG. Correct. So the duty to indemnify is different than the duty to defend. However, the duty to indemnify is based on actual coverage available under the policies in this case. And it has been, you know, repeatedly upheld through the courts is that the CAD exclusion applies to preclude coverage. So that's why there's no indemnity obligation on behalf of TIG to go out and pay for what would be considered the necessary repairs in this case. Once this endorsement kicked in, that's it. There was no coverage. Correct, Your Honor. Can you turn to the issue of the bad faith claim and why it is that you did not argue on appeal that these arguments had been waived? And what do we do with that now? Because I think that we would, had you preserved or made the argument that the bad faith argument the plaintiffs now try to make are waived, we could perhaps address those as a waiver issue. But now that you didn't do that, I'm not sure we can do that. And you've only argued the merit. So. That's correct, Your Honor. And TIG thought it was necessary to address the claims on the merits, you know, given the substantial exposure that comes with a bad faith claim and an allegation that they failed to defend. It was pertinent on TIG's part to get out ahead of it. That you waived the waiver? I'm not sure we waived the waiver because you're talking explicitly about the motion for leave to amend, correct? Talking about in this appeal. Correct. You never argued that the plaintiffs are raising arguments for the first time that were not raised below and in fact were precluded from being raised when their motion for leave to amend was denied. I think you could say we waived it as it pertains to the motion for leave to amend, but the appellates also filed a motion for summary judgment at the lower court that did address bad faith claims, if I'm not mistaken. They raised a bad faith claim, but it was it was very different than the one that they're arguing on appeal. Okay, right. And again, I think addressing the merits when the bad faith claim is out there is important from an insurance carrier's perspective doing business in the state of Washington. So the fact that the appellates in this case brought a bad faith claim, I think it was pertinent for TIG to address it and address it on the merits. And you couldn't have said it's waived, but in the event the court find it's not waived, here's our argument. You just said here's our argument. Looking back on it, I think that's probably what TIG should have done. An extra little sentence might have helped. Yeah, next time. But I guess to briefly address the bad faith argument, since it is before the court today, bad faith requires a finding of unreasonable, frivolous or unfounded conduct by the carrier. In this case, there's a lot of back and forth about the duty to defend. I don't think the duty to defend is properly before this court. TIG picked up the defense immediately and defended through the settlement of this matter. The real question or the real bad faith allegations arise out of the failure to indemnify, which as I previously stated, it has to do with the actual coverage available under the policy. TIG properly reserved on its rights, properly issued coverage position letters, defended throughout the whole time. They did at one point assign its own defense counsel, but assigning its own defense counsel is not an act of bad faith. In fact, this is not a consent policy. TIG had the right to assign defense counsel of its choice. You know, there's a multitude of reasons of why an insurance company might choose to assign defense counsel, whether it be through conflict or past work experience. That's simply what happened in this case. He came on the scene right as the case was going to mediation. Is that right? I believe a little before that, but yes, around. It's October 2017, I think is the time frame, which is around mediation. Did he do the mediation, that lawyer? They were involved in mediation. I'm not sure if that attorney explicitly attended mediation, but they were involved and were sending correspondence back and forth between the parties or other defense counsel. And to another point, there's allegations that TIG fired defense counsel. TIG never fired defense counsel. The original defense counsel stayed on and continued to defend the insured. It just so happens TIG brought in its own defense counsel to also assist in the defense, But TIG stopped paying them, the original counsel? TIG began paying it for its own defense counsel. That's correct. But continued to pay for it? Continued to pay for defense counsel. For the old counsel. Continued to pay for it. No, they paid for their new counsel. And Hanover paid for the old counsel. So that's the complaint about the burning policy. Right. But Washington is a selective tender state. And the fact that the, I guess, Highmark in this case elected to tender to both insurance carriers, that's out of the control of TIG. We can't, you know, TIG can't, you know, has no say on who gets tendered to. So, you know, they elected to assign their own defense counsel and pay for it. But the Highmark was never left without a defense. Was there a settlement proposal made during the mediation by TIG? I believe TIG made a offer prior to the mediation. I'd have to go back through the record to say for certain. But there was discussions about the proper amount for each homes. But when it came to mediation, TIG did not offer any money for settlement. But again, they didn't have any duty to indemnify based on the CAT exclusion, which that position was communicated to the insured prior to the mediation occurring. And one last point I'll make is that throughout the pendency of this case, Highmark also had its own personal counsel involved in the case. And there's nothing in the record that reflects any displeasure on the behalf of Highmark with the defense being provided. It seems to be an issue being raised by the assignees in this case, you know, post-settlement, where they're raising the issue of, you know, whether defense counsel, you know, properly acted and properly had the best interests of Highmark while conducting its defense. One last thing, your honors. The appellant's brief raises, or at the lower court, there's action, or there's claims against TIG for violations of the Washington Administrative Code. IPCA, the CPA, those claims were not addressed in the appellant's opening brief, and it's TIG's position that those have been waived and are not properly before this court. Okay. Thank you for your argument.  A couple things unpacked there, your honors. First of all, they acknowledge this is an occurrence policy in oral argument. They said this is an occurrence policy. There can only be occurrences for houses that are built. Houses that are built can't have damages because they haven't occurred. The actual construction hasn't occurred during that policy period. So four houses built in the first policy period, there can be four occurrences. The 21 other occurrences cannot occur until the houses are built, right? That is why they should not be able to add them together. You read this policy as a complete policy one year at a time. Seattle Pacific, the Seattle Tunnel, the reason the court needed that analogy is because it needed the timeframe to be a policy period or a project policy. It's not, the court didn't realize it wasn't a project policy. That's why if it went back and read the actual record, you'll find it's a 78 or 72 month policy. And so that's the proper way to read a policy. There's not another case in the state of Washington history that has ever extended a policy to deny coverage like they're trying to do. Never. There's not a single one. There's the pollution cases where they've triggered covered because there's a tangential connection between, because the pollution continues. There is no connection between the four houses in one policy period and the 21 houses. They have distinct certificate of offices and a CGL policy. Once they're built, then there was completed operations coverage. So there's coverage to the end of the policy period, then coverage is over. Their own denial letters say that. There's no coverage for those houses. Excuse me, let me do it this way. I understand that these are three successive policies for one year each. I get that. Yes. What if you have a policy that has an exclusion that says we will not cover damage caused by water pollution? And it doesn't say with respect to policy period, it just says we will not cover that. Well, here we have something that says we don't cover tract houses and it defines tract houses. Why do we say, but there has to be a tract house built within the year. The answer to that is if this was a department project where there's different occurrences that transcended the policy period, i.e. the certificate of office is the defining point, right? Where the completed operations is. That's where the current has to occur for the damage. So it actually goes across the policy periods, right? So you'd want that language in that policy, right? There's several walks. There's a Ballard case. It's a Ballard Square case. It talks about the same kind of analysis. Like, well, of course, it should be covered because the construction, you can't tell when the damage occurred before or after the occurrence happened in this policy period. Therefore, they counted the whole project. This is individual certificate of offices that have definite points of completion where coverage doesn't occur. Let me ask you a different question. Did Highmark construct tract housing? Not as they define it. And I want to be clear, your honor. Now, how do you define it then? What's tract housing in your view? They were not the developer of this project. I don't know. Let me ask you a question. How would you define tract housing? I would identify it as the guy that initially submitted the plans for the entire plat. Council mentioned this wasn't a development, right? A project. That guy went into bankruptcy. It's in the work, the paperwork. So what happened was it went into bankruptcy. Once it went into bankruptcy, Highmark came along. And I don't know how many houses were built beforehand, but it started buying. Let me ask the question in a different way. Is the housing at the Vintage Hills project tract housing? Not according to the city, wouldn't be. Read the city ordinances is how they submitted the paperwork for each house individually. The original developer, it was tract housing because it submitted a development project plat and development. Once he went bankrupt and Highmark came in and started submitting individual declarations or declarations, excuse me, plans for each house and each house had to be individually approved. Whereas the original developer came in and said, here's everything we're going to build. Here's our plat. Here's our tract housing, right? But that's not what Highmark did. It came in after the project tract housing was all developed. It went bankrupt, and then it started submitting individual houses to be built. Does that make sense? A couple more things. There was not concurrent coverage here. Is that in the record? Yes, it is in the record. Council misspoke when he said there's concurrent coverage. Council, you're over your time. So if you could wrap up. Oh, I appreciate it. There was not concurrent coverage. It was three consecutive policies by TIG and then policies issued to Hanover, but there weren't concurrent coverage for the same risk. They were separate risk. Three policies, three policies, all consecutive. Thank you for your argument. Thank you. This case is now submitted and the court will stand in recess. Thank you.
judges: FLETCHER, PAEZ, DESAI